CAMPBELL *et al.* v. STATE *ex rel.* BRETT, *County Attorney.*

No. 499.    Opinion Filed January 19, 1909.

(99 Pac. 778.)

1.    **COUNTIES—Indebtedness—Limitations.** Section 2, art. 8, c. 32
p. 256, Sess. Laws Okla. 1897, providing that "the court fund
shall be used only for the payment of witnesses, jurors, stenog-
raphers, bailiffs, janitors for the district court, and the fees of
the justice of the peace, probate judge, constables, and clerks of
the district court, and, in counties which have heretofore or which
may hereafter construct courthouses or jails to be paid for by an
annual rental, such rental shall be a proper charge against the
court fund, and an additional levy, not exceeding three mills,
may be made for that purpose" is repugnant to section 26, art. 10
(Bunn's Ed. sec. 292; Snyder's Ed. p. 316), of the Constitution
of Oklahoma, and not in force in the state of Oklahoma, in so
far as it relates to the construction of courthouses and jails.

(Syllabus by the Court.)

*Error from District Court, Washita County.*

Action by the State, on relation of R. Brett, County Attorney
of Washita County, against A. O. Campbell and others.   Judgment
for relator, and defendants bring error.   Affirmed.

On the 16th day of September, A. D. 1908, the defendant in
error, as plaintiff, commenced an action in the district court of
Washita county, state of Oklahoma, against the plaintiffs in error,
as defendants, for a writ of injunction, by petition, alleging that
the said plaintiff, Rutherford Brett, the relator, was the duly
elected, qualified, and acting county attorney of Washita county,
Okla.; that the said defendants H. A. Kenner, T. G. Sappington,
and J. T. Hinds in like manner constitute the board of county
commissioners, and W. B. Tharrington the county clerk of said
county; that on the 26th day of May, A. D. 1908, the said board
of county commissioners made and entered into a contract in writ-
ing, with their codefendant A. O. Campbell, which was denomi-
nated a rental contract for the building by him of a courthouse in
the town of Cordell in said county, under and in accordance with

the provisions of section 2, art. 8, c. 32, p. 256, Sess. Laws Okla.1897, according to certain plans and specifications provided by said board. Said contract, among other things, provided that the said A. O. Campbell should build and complete said courthouse within 225 days from the execution of said contract, and that the said board of county commissioners would make to the said Campbell 20 semiannual payments in consideration of the completion by him of said courthouse, all of said payment to be made by warrants on the county treasurer of said county, and attested by the county clerk of said county, and to be payable in 20 installments, covering a period of 10 years, and to begin on May 1, A. D. 1909. It is further provided by said agreement that after the expiration of said 10 years the title to said courthouse shall be vested in said county, provided the payments are met according to the terms and provisions of said contract, and after the said A. O. Campbell shall have received from said county, on said warrants, the total sum of $139,252.67; that said board of county commissioners are threatening, and are now about to draw all warrants provided for in said contract, and have the same duly attested by the county clerk of said county, for the purpose of carrying out said contract with said A. O. Campbell, and are about to and will deliver said warrants to said A. O. Campbell, unless restrained by said court; that said board of county commissioners is preparing to and will make a levy against the taxable property of said county for the purpose of creating a fund to redeem said warrants about to be issued as aforesaid, unless said board is restrained from so doing; that said defendant W. B. Tharrington, county clerk, is about to and will attest said warrants when issued by said board, unless restrained by said court, and that the said defendant A. O. Campbell is threatening and is about to enter upon the discharge of his alleged duties under said contract, by beginning the construction of the courthouse provided for in said contract, and unless restrained by said court will carry out the terms of said contract on his part; that said board of county commissioners are acting without authority of law in their effort to make and carry out said contract, and that the actions of said board are in direct conflict with paragraph

"b," § 6, art. 17, of the Constitution of the state of Oklahoma (Bunn's Ed. § 332), and that same is therefore void, for the reason that the town of Cordell, otherwise known as New Cordell, was by section 8, art. 17, of the Constitution of the state of Oklahoma (Bunn's Ed. § 335), designated as the county seat of said Washita county, Okla., and that since said town was designated the county seat of said county, there has been no election held, and no vote of the people of said county taken on the re-location of the county seat of said county, and that said contract provides for the expenditure of the public moneys of said county for the construction of said courthouse prior to the 1st day of April, A. D. 1909; that if said board of county commissioners and said county clerk and said A. O. Campbell are not restrained from carrying out the terms and provisions of said contract, the citizens and taxpayers of said county will be compelled to bear the burden of taxation necessary to raise funds with which to redeem said warrants, and that a great and irreparable injury will be sustained by said county of Washita, the citizens and inhabitants thereof and that the plaintiff has no adequate remedy at law, and an injunction is prayed for.

In said contract among other things, it is agreed:

"That said building shall be and remain on the ground, the title of which shall be and remain in the said county, and shall be and remain, at all times, a public building in the possession of said county, to be used for public purposes under the terms of this contract. * * * That should the state of Oklahoma, said county or any of the officers thereof, attempt to tax such building at any time during the life of this, or should any special assessment for paving, sewerage, or any other purpose, be levied upon or against said property that the said county will pay any and all of such tax or such assessments as an additional rental over and above the rental stipulated for in this contract. It is further agreed that from and after the time of the taking possession of said building by said county, that said county shall be entirely responsible for said building and the care and maintenance of the same, and shall make any and all repairs and alterations which may be necessary or desirable arising from any cause whatsoever, at the expense of said county. It is further agreed that this rental contract shall not terminate by the partial or total destruction of

the building, built under the terms hereof, by fires or otherwise, it being distinctly understood and agreed that said county shall at all times protect its interest in said building, the interest of the party of the first part, and the holder or holders of the warrants herein provided for, by insurance, as above provided, at its own risk and expense. It is further agreed that upon payment in full of the sum of $139,252.67, evidenced by said warrants above set out, as rental thereon, for the said period of ten years, then said building shall become the property of said county. It is further agreed that said county, in order to meet the said payments herein provided for, and each and every one of them, does make said payments and the warrants issued in evidence thereof, a charge upon the court fund of said county, for the respective years covered by this contract, until said warrants are paid in full. And further agrees that each and every year during the period of this rental contract and until each and every one of said warrants are paid in full, it will make an additional levy for the court fund on all the taxable property in said Washita county, in the sum of three mills, or so much thereof as may be necessary, to be paid and collected as other taxes are paid and collected, and to be applied by the county treasurer of said county to the payment of the warrants due for the rental of said building, as above described. It being distinctly understood and agreed that the revenue to be derived from the additional court fund to be made in the sum of three mills, or so much thereof as may be necessary, is to be set aside for the payment of the semiannual rental provided for by this contract, evidenced by the warrants hereinbefore referred to, and is to be used for no other purpose whatever, and said levy shall be in addition to the regular court fund levy for other purposes, and for the faithful application of said revenue derived from said additional levy above set out from year to year as the said tax is levied and collected, and said rental payments become due, the said county acknowledges itself firmly bound.

Thereafter, on the same day, the defendants filed their answer, admitting the allegations contained in said petition, with the exception that they averred that the only levy which the said board of county commissioners are intending to make upon and against the taxable property of said county for the current year is for a sum sufficient to pay the warrants becoming due May 1, and November 1, 1909, as alleged by plaintiff; that the amount

of said levy as provided for by the terms of said contract will not exceed any of the limitations provided in section 9, art. 10, of the Constitution of the state of Oklahoma (Bunn's Ed. § 274), or any other limitation therein provided, upon the powers of the boards of county commissioners of the various counties of the state. Further, the defendants specifically denied that said board of county commissioners acted without authority of law in the execution of said contract, and that the provisions of same are in conflict with paragraph "b," § 6, art 17, of the Constitution of this state, and are for that reason void, but averred that it is specifically provided in said contract, between said board of county commissioners and the defendant A. O. Campbell, that said warrants are not to be considered a present charge or obligation against said Washita county, but to be a charge against the revenue of said county to be levied from year to year, as provided therein for the payment of the rental due for said courthouse, as the same shall become due and payable, and that said contract in no wise provides for the expenditure of any public money for courthouse construction, but simply provides for the payment of two certain specified semiannual sums as rental for said courthouse for the period of 10 years, and that said rental so provided for by virtue of the terms of said contract is reasonable and just, and no higher than the county of Washita would be compelled to pay for the necessary accommodation of its public officers, including an office for the clerk of the district court of said county and a district courtroom, in the event that said board should be compelled to provide such offices and courtroom under any other rental plan, the said county being wholly without any habitable courthouse or other building or buildings which can be used for such purpose. The defendants further admit that since the adoption of the Constitution of the state of Oklahoma, there has been no county seat election in the county of Washita for the purpose of relocating the county seat, but aver that on the 7th day of August, A. D. 1900, an election was duly held in said county for the purpose of removing the county seat of said county

Vol. 23—8

from the town of Cloud Chief, to the town of New Cordell, and at said election a large majority of the legal voters of said county voted in favor of the removal of said county seat from said town of Cloud Chief to said town of New Cordell, and same was, by reason of said election, legally removed and relocated at said town of New Cordell; that thereafter, on the 3d day of March, A. D. 1906, an act of the Congress of the United States was duly approved, by the terms of which the action of the electors of Washita county in so removing and relocating its county seat was in all things confirmed and ratified, which act is in words and figures as follows:

"Be it enacted by the Senate and House of Representatives of the United States of America, in Congress assembled, that the action of the majority of the electors of Washita county, Oklahoma, as determined by an election held on the 7th day of August, *Anno Domini,* nineteen hundred, for the purpose of removing the county seat of said county from the town of Cloud Chief to the town of New Cordell, in said county, be and the same is hereby, in all things ratified and confirmed, and the county seat of said county is hereby declared to be at the said town of New Cordell." (Act March 3, 1906, 34 Stat. c. 512, p. 50.)

By reason of which the defendants averred that the provisions of paragraph 3, § 6, art. 17, of the Constitution of the state of Oklahoma, do not apply to said Washita county.

Thereafter, on the 19th day of October, A. D. 1908, the plaintiff and defendants in said action filed an agreed statement of facts, in words and figures as follows:

"(1) That the annual levy which will be required under the terms and provisions of the written contract attached to plaintiff's petition as 'Exhibit A' will not exceed any of the limitations provided in section 9, art. 10, of the Constitution of the state of Oklahoma, or any other limitations placed upon the boards of county commisioners of the various counties of this state; (2) that the amount of the annual levy provided for in said written contract so attached to said petition of plaintiff is reasonable and just, and not higher than the county of Washita would probably be compelled to pay for the necessary accommodation of its public officers, including an office for the clerk of the district court of said county, and a district courtroom in the event that said board

should be compelled to provide such offices and courtroom under some other rental plan, inasmuch as it is a fact that the said county of Washita is wholly without any courthouse, or other buildings fit for use as such, or for occupancy by its public officers, and said county has no fireproof vault within which it can safely keep its public records, and in which to keep the files and records of the district court of said county; (3) it is further agreed that an election was held on the 7th day of August, 1900, in said Washita county for the purpose of removing the county seat from the town of Cloud Chief to the town of New Cordell, and that said election resulted in a large majority of the votes cast by the legal voters of said county in favor of such removal, and that subsequent thereto the county seat of said county was in fact removed from said town of Cloud Chief to that of New Cordell, and has ever since remained at the latter place, also that the Congress of the United States enacted the provision set out in the fourth paragraph of the answer of defendants as herein alleged."

Thereafter, on the same day, said cause was submitted to the court upon petition of plaintiff, the answer of defendants, and the agreed statement of facts, and the argument of counsel, both on behalf of the plaintiff and defendants, having been heard, the court took the same under advisement, and thereafter, on the 26th day of October, A. D. 1908, the court rendered its decision thereon in favor of the plaintiff and against the defendants, making certain findings of fact and conclusions of law, in words and figures as follows:

"That on the 26th day of May, 1908, the board of county commissioners of Washita county, Okla., composed of H. A. Kenner, T. G. Sappington, and J. T. Hinds, entered into a contract with the defendant A. O. Campbell, by the terms of which contract the said A. O. Campbell agreed to erect a courthouse for Washita county, Okla., costing the total sum of $139,252.67, to be paid for on the rental plan, as provided by section 2, art. 8, c. 32, p. 256, Sess. Laws Okla., 1897, said contract further providing that the county of Washita should issue warrants payable semiannually, the aggregate of said warrants to equal the total cost of said building, as above specified.

"The court further finds that the annual levy, which would be required under the terms and provisions of said contract would not exceed any of the limitations provided in section 9,

art. 10, of the Constitution of the state of Oklahoma, and would not exceed any of the limitations fixed by law.

"The court further finds that said section 2, art. 8, c. 32, p. 256, Sess. Laws Okla., is in full force and effect, and has not been repealed by paragraph 'b,' § 6, art. 17, of the Constitution of the state of Oklahoma, nor by any other provision in said Constitution.

"The court further finds that said contract so executed as aforesaid is, in effect, a contract to erect a courthouse for Washita county, Okla., and as such is in violation of said paragraph 'b,' § 6, art. 17, of the Constitution of Oklahoma, and is void, for the reason that said section provides that no public money should be expended for the erection of jails and courthouses until after the 1st day of April, 1909.

"The said constitution further provides that if an election for the relocation of the county seat is to be had, a petition must be filed asking for such relocation at least six months prior to the 1st day of April, 1909.

"The court further finds that said contract having been executed before the 1st day of October, 1908, and, in other words, more than six months prior to the 1st day of April, 1909, is premature, and is in violation of said constitutional provisions, and the said injunction shall be allowed and made permanent, notwithstanding the fact that it was admitted in open court by all the parties to this petition that no petition for an election to relocate or remove the county seat of said Washita county had been filed or prepared on or prior to said October 19, 1908."

A permanent injunction was issued against all of the defendants. Thereafter, on the 28th day of October, A. D. 1908, the defendants filed their motion for a new trial, assigning the following reasons therefor:

"(1) Because the judgment and findings of the court are not sustained by sufficient evidence; (2) because the judgment and findings of said court are contrary to law; (3) because the court erred in granting and entering an injunction enjoining the defendants from carrying out their several duties under and by virtue of the contract set out in plaintiff's petition."

Thereafter, on the same day, said motion was overruled by the court, to which action of the court exception were duly saved, and said cause is now properly before this court for review.

*Shartel, Keaton & Wells* and *Massengale & Duff,* for plaintiffs in error.

*R. Brett,* Co. Atty., for defendant in error.

No copies of briefs reached the reporter.

WILLIAMS, J. (after stating the facts as above). The following questions are raised on this record: (1) Does the contract provide for the expenditure of the public moneys of Washita county, Okla., for the construction of a courthouse, within the meaning of section 6, art. 17 (Bunn's Ed. § 333; Snyder's Ed. p. 341) of the Constitution of Oklahoma? (2) Does section 6, art. 17 (Bunn's Ed. § 333; Snyder's Ed. p. 341) of the Constitution of Oklahoma, prohibit the board of county commissioners of Washita county from expending the public moneys of said county for the building of a courthouse prior to April 1, 1909? (3) Is section 2, art. 8, c. 32, p. 256, Sess. Laws 1897 (Section 5887, Wilson's Rev. & Ann. St. 1903), repugnant to section 26, art. 10 (Bunn's Ed. § 292; Snyder's Ed. p. 316), of the Constitution of Oklahoma. In view of the determination hereinafter reached it is only essential to pass upon the last question.

Section 8, art. 10, of the Constitution of West Virginia of 1872, provides:.

"No county, city, school district, or municipal corporation, except in cases where such corporations have already authorized their bonds to be issued, shall hereafter be allowed to become indebted, in any manner, for any purpose, to an amount, including existing indebtedness in the aggregate, exceeding five per centum of the value of the taxable property therein to be ascertained by the last assessment for state and county taxes, previous to the incurring of such indebtedness, nor without, at the same time, providing for the collection of a direct annual tax, sufficient to pay annually the interest on such debt, and the principal thereof, within, and not exceeding, thirty-four years; Provided, that no debt shall be contracted under this section, unless all questions connected with the same, shall have been first submitted to a.vote of the people, and have received three-fifths of all the votes cast for and against the same."

In the case of *Davis v. County Court,* 38 W. Va. 108, 18 S. E. 373, the court said:

"The county court may expend the current revenues and accrued funds, and make contracts looking to that end, as that which the court may have the means of paying, either in the treasury or by the current fiscal levy, is not the contraction of debt within the meaning of the Constitution, but is merely the appropriation and application of the annual income of the county to the legitimate purposes for which it was accumulated and levied. But where the county authorities attempt to or do bind, without a proper vote of the people, the levies of future years in any manner, or for any purpose whatsover, either by contract, express or implied, their action in so doing is a usurpation of power and an infringement of the Constitution, and such contract is null and void, and is not a good consideration for any future orders on the funds of any future year, and all orders issued on such considerations alone are invalid."

Section 157 of the Kentucky Constitution provides as follows:

"No county, city, town, taxing district, or other municipality, shall be authorized to become indebted, in any manner or for any purpose, to an amount exceeding in any year, the income and revenue provided for such year, without the assent of two-thirds of the voters thereof, voting at an election to be held for that purpose and any indebtedness contracted in violation of this section shall be void."

The case of *Beard, etc., v. City of Hopkinsville, etc.*, 95 Ky. 241, 24 S. W. 874, 23 L. R. A. 402, 44 Am. St. Rep. 222, arose on the following state of facts: On June 13, 1892, the appellee, through its board of councilmen, entered into a contract with its co-appellee, John P. Martin, by the terms of which the latter agreed to construct and maintain, in and near the city, a system of waterworks and sewerage, and also an electric light plant. For the use of 20 hydrants for 5 years, and of 35 arc lights for the same period, the city agreed to pay Martin, as rent, the sum of $5,000 per year. At the expiration of the 5 years the contract for water rental was to continue 15 years longer at $4,500 per year, the city having the option to renew the contract for lights at $1,000 per annum. Judge Hazelrigg, in delivering the opinion of the court, said:

"It is to be remembered that the annual rentals are to be met

out of the annual revenues, without any increase of the tax rate of 75 cents on the $100 of taxable property, and that, as the contractor Martin, furnishes the water and light, and thus earns the money he is paid therefor, the appellees, therefore, contend that the liability is thus extinguished as soon as it comes into existence. They contend that when liabilities are created and appropriations are made which are within the limits of the revenue accruing to meet them, they are not debts within the meaning of the prohibition of the Constitution. The cases relied on by them sustain their contention that revenues may be disposed of in advance of their receipt, hypothecated, as it were, as if already in the treasury, and when such an appropriation will meet and discharge the obligation, which is but a contingent one, no indebtedness is created, in the meaning of the Constitution. We suppose, however, that if the words used in the Constitution are to be given their usual and commonly accepted meaning by the contract in question, the city does incur an indebtedness in the sense these terms are used in the Constitution; and that this indebtedness is in excess of the limitation imposed is apparent. * * * We have adopted this view in accord with the spirit of the Constitution as we understand it, and as we think, also, in accord with better reason. Any other doctrine opens the door to all the mischiefs intended to be inhibited by the Constitution. A fair illustration of the doctrine contended for by the appellees is given in the case of *Dively v. City of Cedar Falls,* 27 Iowa, 232, relied on by them, where it is held that if A. should undertake to build a courthouse within three years, doing so much and to be paid accordingly each year, the obligation of the contract would arise when executed, but the indebtedness, under the Constitution (if there were none other), would be measured by that to be paid each year. It seems to us that such a construction of the Constitution would render the limitations in question wholly nugatory. It is needless to notice any other of the reasons urged against upholding the contract, as the views here announced are fatal to its validity."

Section 8, art. 9, of the Pennsylvania Constitution of 1873, provides:

· "The debt of any county, city, borough, township, school district, or other municipality or incorporated district, except as herein provided, shall never exceed seven per centum upon the assessed value of the taxable property therein, nor shall any such munici-

pality or district incur any new debt or increase its indebtedness to an amount exceeding two per centum upon such assessed valuation of property, without the assent of the electors thereof at a public election in such manner as shall be provided by law; but any city, the debt of which now exceeds seven per centum of such assessed valuation, may be authorized by law to increase the same three per centum, in the aggregate at any one time, upon such valuation."

The case of *Brown et al. v. City of Corry et al,* 175 Pa. 528, 34 Atl. 854, rests upon the following state of facts: On March 25, 1895, without any ordinance having been enacted authorizing it, without first having obtained the assent of the electors, and without any public notice, but by authority of a resolution introduced and adopted that night, the officials of the city entered into a contract with Joseph F. Witmer, by which he agreed to construct a system of waterworks for the city, and deliver the same to the city complete, which waterworks was then to be operated and controlled by the city, but the title to which was to remain in the said Witmer, until the final fulfillment by the city of its part of the contract. The contract provided for the payment to Witmer of $6,000 annually for 20 years, and for depositing, in addition, in some trust company the annual sum of $3,000 or $4,-000, as it may elect, for 20 years, the whole amount to be then given to Witmer with the accumulated interest, in case the city elects to deposit $3,000 annually; the city to be entitled to the interest in case it elects to deposit $4,000. Upon the performance by the city of its part of the contract Witmer agrees to transfer the system of waterworks to the city. By a "supplementary statement," on April 19, 1895, it was declared to have been the original intention of the parties to the agreement that the annual payment and deposits provided for by the agreement are payable, and shall be paid, and set aside annually from the current revenue of said city, and not otherwise, and, further, that if the said revenues are insufficient to meet the payments and deposits as stated, then the interest of the city in said waterworks should revert to the

said J. F. Witmer, or his assigns, and the contract should be terminated. The court said:

"What then, is the nature and purpose of this contract? Is it a contract for the supplying of the city of Corry with water for public and private use for a term of years? If so, it does not create an addition to the municipal indebtedness. Or is it a contract to supply the city a 'system of waterworks,' something to be furnished all at once, and not continuously through the whole term, covered by the contract? Is the consideration for the city's engagement 'received at once, instead of being yielded in the future, or at intervals'? If it is, unless the agreement that the installments shall be paid only from the current revenues modifies the liability it creates a debt within the constitutional prohibition. It seems to me that by no reasonable construction can the contract be deemed one for supplying the city with water, but it is one for furnishing it with a plant to be delivered to it at once, to be paid for by the city in installments. The carefully worded specifications as to the material to be used, and the work to be done, the character and capacity of the machinery, and building to be supplied and erected, the provision for the operating the works by the city at its expense, the delivery of possession to the city, are all inconsistent with any other purpose than that of purchase and ownership of the waterworks by the city, even if the engagement to pay could be only a liability to pay for the supply of water. That engagement is, however, plainly an agreement to pay the several installments, as purchase money for the plant, and not for the annual supply of water. The cost of erecting such a plant is a most extraordinary, and not in any sense an ordinary, expense. Notwithstanding the ingenious argument of the counsel for the defendant, I can see a very clear distinction between a contract for a supply of water and one for the means of furnishing the supply. The one may pertain to an ordinary expense, and the other, if it involves municipal purchase and ownership of the means of furnishing the supply, can only pertain to an extraordinary expense."

The court further said:

"It is a conceivable case that the payments provided for may be made for 10 years, when a council elected upon an issue, which may easily arise, as to whether the policy adopted by the city for procuring waterworks shall be continued shall refuse to make payment of the installment due the eleventh year, and make no ap-

propriation therefor notwithstanding the revenues for the year are amply sufficient for the purpose. In such a contingency the contractor would have a clear right to enforce the payment of the eleventh installment, if the contract were a valid one. How, then, can it be said that the amount agreed to be paid is not a debt? Moreover, it is a debt secured by the payments that will have already been made, and equitable interest existing thereby in the city will become forfeited upon default in paying the installment then due. It is a debt for the purchase money, and in principle analogous to the debt for purchase money paid for land for which a mortgage has been given with no accompanying personal obligation, which is universally termed 'a mortgage debt.' In the case I have supposed of the payment of the installments for a series of years the interest acquired by the city is hypothecated to secure the payment of the remainder of the debt, and in principle cannot be distinguished from the case of *Mayor and City Council of Baltimore v. Gill,* 31 Md. 375, cited by the counsel for the plaintiff, in which the city of Baltimore attempted to borrow money by hypothecating certain shares of stock owned by it, with the provision that the stock should be liable for the debt. In the opinion in that case the court said: 'It has been argued that no debt has been created by the ordinance because by the second section it is provided that the parties loaning the money shall look for its repayment exclusively to the stock pledged, and that in no event is the city liable or responsible for the return or repayment of any part thereof, even though the stock pledged should prove insufficient. This provision was doubtless adopted for the purpose of avoiding the restrictions imposed by the Constitution. We think it altogether insufficient for that purpose.' A debt is money due upon a contract, without reference to the question of the remedy for its collection. It is not essential to the creation of a debt that the borrower should be liable to be sued therefor. The plain interest of this section is to restrain the municipal government of Baltimore from borrowing money except for the purposes and in the manner prescribed either upon the general credit of the city, or by a pledge of its revenues or assets, thereby creating a debt and imposing additional burdens upon the citizens, which may directly or indirectly involve increased taxation. In *Newell v. People,* 7 N. Y. 9, it was also held that the borrowing of money, to be paid for certain revenues, and not otherwise, was the creation of a debt, and as such a violation of the constitutional provision prohibiting the incurring of an indebtedness beyond certain prescribed limits."

Our ancestors, on account of the unlawful assumption and abuse of the taxing power, were moved to resist ·English kings, and as a result our great charters of liberty were acceded to. By the attempted exercise of the right of taxation without the consent or approval of those who were to be taxed, the fires of the Revolution were kindled, lighting the way to the establishment in the New World of a republic that demonstrated the practicability of popular government. In the history of the framing, revising, and amending of the Constitution of the several states we have an elucidation of the efforts of the people to protect themselves against the governmental taxing agency. In England it was against the crown; in the American states against the improvident assumption of their representatives. Taxes levied and derived from the people are in every instance an appropriation by the people to the government, to be expended in furnishing protection, security by the government within its proper functions, and facilities for the public welfare. This principle is a characteristic of the wake of Anglo-Saxon liberty, and has resulted as a restraint upon the government in preventing extravagant expenditures, as well as unjust and tyrannical action against the rights of private property. Property is never secure from the lawless grasp of the government, unless the means of existence of the government depend upon the voluntary grants of those who own the property. Hence we find the limitations, checks, and restraints in our Constitutions.

Section 23, art. 10 (Bunn's Ed. § 289; Snyder's Ed. p. 314), of our Constitution, is a limitation upon the power of the state to contract debts to meet casual deficits, or failures in revenue, or expenses not provided for. Section 24 removes any limitation against the power to contract debts when the peace, safety, and public welfare is in danger, to wit, for the purpose of repelling invasion, suppressing insurrection, or to defend the state in war; but the specific restriction is additionally imposed that funds arising from the contracting of such debts shall be applied to the purpose for which they were raised, or to repay such debts, and to no other purpose whatever. Section 25 is an additional limitation, providing that, except the debts specified in section 23 and 24, no

debts shall be contracted by or on behalf of the state unless the same shall be authorized by law for some work or object to be distinctly specified therein, and such law shall impose and provide for the collection of a direct annual tax to pay, and sufficient to pay, the interest on such debt as it falls due, and also to pay and discharge the principal of such debt within 25 years from the time of the contracting of the same, and shall not become effective until approved by a majority vote of the people. Section 26, the construction of which is essential for the determination of this case, provides that:

"No county, city, town, township, school district, or other political corporation, or subdivision of the state, shall be allowed to become indebted, in any manner, for any purpose, to an amount exceeding in any year the income and revenue provided for such year, without the assent of three-fifths of the voters thereof, voting at an election to be held for that purpose, nor in cases requiring such assent, shall any indebtedness be allowed to be incurred to an amount including existing indebtedness, in the aggregate exceeding five per centum of the valuation of the taxable property therein, to be ascertained from the last assessment for state and county purposes previous to the incurring of such indebtedness: Provided, that any county, city, town, township, school district, or other political corporation or subdivision of the state, incurring any indebtedness requiring the assent of the voters as aforesaid, shall, before or at the time of doing so, provide for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for the' payment of the principal thereof within twenty-five years from the time of contracting the same."

The settled purpose has been to place restrictions and limitations upon the taxing power, by a restriction upon the outlay of the money after it has been collected from the people. Under these provisions the government is dependent from year to year upon the periodical vote of supplies. In some instances this vote will come from the representatives or agents, who are newly chosen by the people, and who will be expected to reflect their views regarding the public expenditures. Whenever a debt is to cover a period of years, it is never to be valid, except when approved by a

vote of the electors of the particular subdivision of the state directly involved.   Authority must be shown for every levy of taxes, not only in the state at large, but also in the political subdivisions thereof.   In the state, authority is derived from the sovereign people; in the political subdivisions, from the state; and the same must be levied in the manner prescribed in delegating the authority.   No one idea stands out more clearly than that barriers should be erected against the creation of municipal indebtedness.   In times of popular clamor and excitement the internal improvement craze often well-nigh wrecks the most flourishing counties and towns, even in staid and conservative commonwealths.   Excuses for withholding the application of these restraints, wisely devised, however, should not be made to delay expenditures unless we find a substantial reason therefor in the organic law of our commonwealth.   The cases of *Bryan v. Menefee*, 21 Okla. 1, 95 Pac. 476, and *In re Menefee*, 22 Okla. 365, 97 Pac. 1014, recently decided by this court, harmonize with these views.

It was the evident intention of the constitutional convention that no county, city, town, township, school district, or other political corporation or subdivision of the state shall be allowed to become indebted, in any manner, for any purpose, to an amount exceeding in any year the income and revenue provided for such year, without the assent of three-fifths of the voters of such political subdivision, voting at said election to be held for that purpose, nor in cases requiring such assent shall any indebtedness be allowed to be incurred to an amount, including existing indebtedness, in the aggregate, exceeding 5 per centum of the valuation of the taxable property therein, to be ascertained from the last assessment for state and county purposes previous to the incurring of such indebtedness, and that no indebtedness can be incurred beyond that year, though an assessment is attempted to be levied for such future years to cover such indebtedness, and where such attempt is made, it is repugnant to the provisions of this Constitution.

We accordingly conclude that section 2, art. 8, c. 32, p. 256,

Sess. Laws 1897, is repugnant to the provisions of section 26, art. 10 of the Constitution, and also the spirit of the entire Constitution relating to public indebtedness, and not in force in this state so far as it relates to courthouses and jails. Schedule to Const. § 2 (Bunn's Ed. § 451; Snyder's Ed. p. 381).

The judgment of the lower court should be affirmed.

All the Justices concur.